## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CITY OF LAKE QUIVIRA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 06-2369-KHV** |
| EMPLOYERS MUTUAL CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

The City of Lake Quivira ("the City") seeks damages for breach of contract, attorneys fees

under K.S.A. § 40-256, and a declaratory judgment that Employers Mutual Casualty Company

("Employers Mutual") has a duty to defend three city agents in two state court actions.  See

Amended Complaint (Doc. #15).  This matter comes before the Court on the City's Motion For

Partial Summary Judgment (Doc. #24) filed June 22, 2007.  The City asks the Court to (1) enter

declaratory judgment that Employers Mutual has a duty to defend under the insurance policy and (2)

order Employers Mutual to specifically perform that duty.  For reasons stated below, the Court finds

that the City's motion should be sustained.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c);

accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d

1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome

of the suit under the governing law."  Anderson, 477 U.S. at 248.  A "genuine" factual dispute

requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

Where an insured files suit against its insurer seeking coverage under a policy of insurance, the insured has the burden of proving that it falls within the coverage provisions of the policy.  More specifically, plaintiff has the burden of proof to establish the nature of any alleged loss and that the

loss claimed was caused by one of the perils insured against (covered) by the policy.  Advantage Homebuilding, LLC v. Maryland Cas. Co., 470 F.3d 1003, 1008 (10th Cir. 2006); Brumley v. Lee, 265 Kan. 810, 963 P.2d 1224, 1232 (1998); Kansas Farm Bureau Ins. Co. v. Reynolds, 16 Kan. App.2d 326, 328, 823 P.2d 216, 218 (1991).  If plaintiff satisfies that burden of proof, then Employers Mutual would have the burden of proving that one or more exclusionary clauses within the policy apply to exclude coverage.  Advantage Homebuilding, 470 F.3d at 1008.

### Facts

The following facts are uncontroverted or, where controverted, viewed in the light most favorable to Employers Mutual, the non-moving party.[1]

Effective April 2, 2003 to April 1, 2004, Employers Mutual issued an insurance policy to the City of Lake Quivira, Kansas.  Employers Mutual renewed the policy from April 1, 2004 to December of 2005.  The policy obligates Employers Mutual to pay "loss" and "defense expenses" to which the insurance applies.  Exhibits In Support Of Motion For Partial Summary Judgment ("Plaintiff's Exhibits") (Doc. #26), Ex. E at 5.  Under the policy, Employers Mutual has the duty to

---

[1]       The City's statement of uncontroverted facts runs less than four pages.  Employer Mutual's statement of additional uncontroverted facts is perhaps one page longer.  Nonetheless, the City begins its summary of the case as follows: "the facts providing the basis for the litigation before this Court, while uncontroverted, are numerous and complex."  Memorandum In Support Of Motion For Partial Summary Judgment (Doc. #25) filed June 22, 2007, at 4.  Plaintiff then provides four more pages of facts in narrative form.  Defendant also includes in its argument section many facts which are not set out in its statement of facts.  The Court ordinarily does not consider facts which the parties include only in the argument section of their briefs and not in the statement of facts required by D. Kan. Rule 56.1.  Also, the Court ordinarily does not consider additional facts which are not set forth in separately numbered paragraphs of opposing memoranda, as required by D. Kan. Rule 56.1(b)(2).  Out of necessity, to frame a cogent narrative of the facts in this case, the Court has done so to a limited degree.  It has not combed the record for evidence which might defeat the City's motion for partial summary judgment, however, and it is not required to do so.  See Hinds v. Sprint/United Mgmt. Co., No. 05-2362-KHV, 2006 WL 3715905, at *2 (D. Kan. Dec. 12, 2006).

defend suits seeking damages which are covered by the policy, and to pay defense expenses with respect to any suit which it defends.[2]  Id.  As to indemnity, Employers Mutual is required to pay "loss," which the policy defines as (1) any sums which an insured is legally obligated to pay as compensatory damages, and (2) any sums which the City may be required or permitted to pay to indemnify an insured for compensatory damages because of a wrongful act by the insured.  Id. at 7.  The "insured" means (1) the "organization" and (2) the "governing board of the 'organization' and each of its lawfully elected or appointed members."  Id. at 6.  The policy defines "organization" as the entity named in the declarations (here, the City) and certain subsidiary "authorities, committees or other boards."[3]  Id. at 6.  In agreeing to indemnify the City for compensatory damages for "wrongful acts" of an insured, the policy defines that term as follows:

> "Wrongful Act" means any of the following:
> 1. Actual or alleged errors;
> 2. Misstatement or misleading statement;
> 3. Act or omission or neglect or breach of duty by an "insured";
> 4. "Personal injury"
> in the discharge of "organizational" duties.

Id. at 8.  The policy does not define "organizational" or "'organizational' duties."

The policy provides two types of exclusions – "Absolute Exclusions" and "Limited Defense Exclusions."   In relevant part, "Absolute Exclusions" exclude coverage for loss and defense expense,  while "Limited Defense Exclusions" exclude coverage for "loss" but not defense expense.

---

[2]     Under the policy, "defense expenses" are sums payable for investigation, litigation, negotiation or settlement of any claim or suit which Employers Mutual deems expedient.  Plaintiff's Exhibits (Doc. #26), Ex. E at 5, 6.

[3]     When it denied a duty to defend, Employers Mutual assumed that the City planning commission meets the requirements for a subsidiary authority, and thus that all three defendants are "insureds" under the policy.

Id. at 8.  Under the policy, "Absolute Exclusions" include the following:

> D.      Intentional illegal acts where:
> 1. Illegality was known prior to commitment of the act; or
> 2. Corrective steps were not taken after the illegality of the act was determined. * * *
>
> G.       "Property damage."
>
> "Property Damage" means:
> 1. Physical injury to tangible property, including all resulting loss of use of that property; and
> 2. Loss of use of tangible property that is not physically injured.
>
> "Property Damage" includes actual or alleged damages or diminution of property values including but not limited to those that arise from the "insured" exercising or failing to exercise its power of eminent domain including:
> a. Condemnation proceedings; and
> b. Inverse condemnation.

Plaintiff's Exhibits (Doc. #26), Ex. E at 8, 15.  The policy provides a "Limited Defense Exclusion" for "[t]he 'insured' exercising its zoning or permitting duties in a land use regulatory capacity." Id. at 8, 15.

Quivira, Inc., is a not-for-profit corporation.  It owns about 100 acres of undeveloped land and a golf course in the City of Lake Quivira.  All homeowners (including all City council and planning commission members) are members of Quivira, Inc.  Patrick McAnany served on its properties committee, which was formed to look at potential acquisitions and concerns about properties surrounding Lake Quivira.  McAnany also served on the City council from 1981 to the present, and was mayor beginning in October of 2002. During the relevant time frame, Leon Rieke served as president of the board of directors of Quivira, Inc. and also served on the City planning commission.  Mike Jones served on the board of directors of Quivira, Inc. and also served on the City planning commission from early 2000 through at least April of 2005.  Because of their role in

5

the state court litigation which underlies this suit, the Court hereafter refers to McAnany, Rieke and Jones as "the defendants."

In the 1980s or 1990s, members of Quivira, Inc. began to set aside money to acquire properties around the City perimeter. Around 2001, Quivira, Inc. explored the possibility of purchasing adjacent land known as the Robertson Property, part of which was within city limits and part of which was within the jurisdiction of the Unified Government of Wyandotte County/Kansas City, Kansas ("Unified Government"). The Robertson Property which is in the City is adjacent to Lake Quivira golf course.

On June 22, 2001, Dale Barnhart purchased an option to buy the Robertson Property. He intended to use the property for residential development and on July 16, 2003, he assigned the option to Quivira Village, LLC., of which he is a principal. On July 18, 2003, Quivira Village exercised the option to purchase the Robertson Property. Quivira Village wanted to annex all of the property into Quivira, Inc.,[4] and Barnhart met with the Board of Directors of Quivira, Inc., to discuss his request. At the time, Quivira, Inc. was investigating the possibility of building town homes, and Barnhart contends that it wanted the Robertson Property for itself. Barnhart believes that the board members therefore felt animosity toward him and his plans for the property. The committee for Quivira Inc. considered and rejected Barnhart's proposed development of the Robertson Property.[5]

---

[4]     The limited record before the Court indicates that Barnhart wanted to annex the property into Quivira, Inc. The parties do not explain how Quivira, Inc. – as opposed to the City – would have the authority to "annex" the property. The Court assumes that Barnhart sought to annex the property into the City of Lake Quivira, so that Quivira Village (as a property owner in Lake Quivira) would become a member of Quivira, Inc.

[5]     The parties do not explain how Quivira, Inc. was authorized to reject the development.

After Barnhart purchased the option to buy the Robertson Property, the three defendants proposed that the City create a buffer zone around the golf course.  The City council ultimately passed Ordinance 213, which restricted all new land uses adjacent to the golf course by requiring a 150 foot buffer between the golf course and any new construction.  According to McAnany, supporters of Ordinance 213 cited several reasons for the buffer, e.g., to provide protection from errant golf balls and to preserve green space and wildlife in undeveloped areas around the golf course.  Plaintiff's Exhibits (Doc. #26), Ex. F at 37.

McAnany sent a letter to the planning commission of the Unified Government regarding concerns about rights-of-way and traffic access if the Unified Government portion of the Robertson Property were developed.  Id., Ex. A at 148; Ex. N, at 205-10.  McAnany also appeared at a meeting to address these concerns.

On September 24, 2003, Quivira Village sued the City in the District Court of Wyandotte County, alleging that the buffer zone violated its property rights under the United States Constitution.  Case No. 03 CV 3821 ("the 2003 suit").  Employers Mutual agreed to defend the City with a reservation of rights.  That lawsuit remains pending.

On December 2, 2004, Quivira Village sued Quivira, Inc., and McAnany, Rieke and Jones, alleging tortious interference with a prospective business advantage and civil conspiracy to commit tortious interference.  Plaintiff's Exhibits (Doc. #26), Ex. C., Case No. 04 CV 3527 ("the 2004 suit").  The petition identified McAnany as mayor and Rieke and Jones as members of the City planning commission, and identified all three defendants as members of Quivira, Inc.  It alleged that defendants had interests in the profitability and overall success of Quivira, Inc., and Count I alleged that defendants intentionally engaged in malicious interference with Quivira Village's expectancy

of future economic benefit from developing the Robertson Property.  Specifically, Count I alleged that Quivira, Inc., and its members had a longstanding desire to purchase the Robertson Property; that they did not want the property to be developed because it would change the character of the golf course; and that defendants had wrongfully used their positions with the City and Quivira, Inc. to recommend approval of the buffer zone to block Barnhart's development.  The petition alleged that Barnhart had told defendants what density his development would require to be economically feasible, and that defendants had wrongfully encouraged the City to consider limited density requirements to thwart his development and allow Quivira, Inc. to purchase the property.[6]  The petition did not specify how defendants had "wrongfully" used their positions to prevent development.  For example, it did not allege what about defendants' buffer zone recommendation to the City council was "wrongful," or whether the City ever enacted the low density requirements which defendants allegedly advocated.  Count II alleged that defendants conspired to commit the wrongful acts set forth in Count I.

---

[6]      The petition in the 2004 suit (as well as the petition in the 2006 suit, discussed below) did not allege that plaintiff had attempted to comply, or intended to comply, with pre-suit notice requirements of K.S.A. § 12-105b (now repealed), which mandates notice of tort claims against a municipality or its employees.  See Plaintiff's Exhibits (Doc. #26), Exs. C, D.  In response to a motion to dismiss the 2006 suit, Barnhart confirmed that he did not claim that the City was vicariously liable for the misconduct of McAnany, Rieke or Jones, or that they had engaged in wrongful conduct within the scope of their municipal duties.  In explaining why he did not comply with K.S.A. § 12-105b in the 2006 suit, Barnhart stated that:

> Clearly, the motives of Defendants Jones, Rieke and McAnany were personal, financial and self-serving and not for the overall good of the City.  It defies reason to suggest that their conduct and actions, which were designed to prevent Plaintiff's development of the Robertson Property - the same property that Q, Inc., wanted to develop for itself - were within the scope of their duties as employees of the City.

Defendant's Opposition (Doc. #27), Ex. 5.

The City presented the claims to Employers Mutual, demanding coverage and a defense under the policy.  On March 18, 2005, Employers Mutual assumed that the petition alleged wrongful acts by insureds, but cited policy exclusions and declined to defend based on the following absolute policy exclusions, among others:

    1. The intentional illegal acts exclusion [Part III - Exclusion D];

    2. The "Property damage" exclusion [Part III - Exclusion G];

    3. Kansas public policy which prevents coverage for claims of intentional torts.

See Plaintiff's Exhibits (Doc. #26), Ex. H at 6-7.[7]  After Employers Mutual refused to defend, McAnany, Rieke and Jones demanded that the City provide a defense.  By letter dated September 19, 2005, the City responded as follows:

> K.S.A. [§]75-6103 provides that each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment.  The allegations of the Petition refer to acts that are outside the scope of any official appointment or employment, and none of the alleged acts were authorized by the Governing Body.

Defendant's Opposition (Doc. #27), Ex. 6 at 3.  Despite the initial denial, the City ultimately funded a partial defense for all three defendants.

On February 3, 2006, Barnhart filed suit in Wyandotte County District Court against Quivira, Inc., McAnany, Rieke and Jones, again alleging tortious interference with a prospective business advantage and civil conspiracy.  See Plaintiff's Exhibits (Doc. #26), Ex. D, Case No. 06 CV 199

---

[7]    In denying coverage, Employers Mutual also stated that it had no duty to defend based on exclusions for (1) acts of fraud or dishonesty, (2) wrongful acts based upon or attributable to an insured gaining any personal profit or advantage to which an insured is not legally entitled and (3) claims made before the policy was issued.  In response, Employers Mutual concedes that these exclusions do not exclude the possibility of liability and thus would not alleviate its duty to defend. The Court therefore sustains the City's motion for summary judgment as to these exclusions.

("the 2006 suit").  The 2006 petition was basically identical to the 2004 petition, except that (1) Barnhart rather than Quivira Village, Inc. was plaintiff and (2) the 2006 petition alleged that McAnany, Rieke and Jones also promoted city requirements for excise taxes, street improvements and curb cuts to hamper development of the Robertson Property.  The petition did not provide any further specific allegations as to how defendants "wrongfully" used their positions to prevent Barnhart's development, or even whether the City adopted the proposed requirements.

The City presented the claims in the 2006 suit to Employers Mutual, demanding coverage and a defense.  On April 19, 2006, Employers Mutual again denied coverage and declined to defend. Employers Mutual cited the same grounds as in the 2004 suit, with the additional ground that the claims were not made during the policy period.

The City paid certain litigation costs for defendants in the 2004 and 2006 suits.  As noted, the 2004 suit is pending.  The state court dismissed the 2006 suit and Barnhart's appeal is now pending in the Kansas Court of Appeals.  On July 26, 2006, the City filed this suit seeking (1) a declaratory judgment that Employers Mutual has a duty defend the suits (Count I); (2) attorneys fees for unjustified refusal to defend under K.S.A. § 40-256 (Count II); and (3) damages for breach of the insurance contract (Count III).

## Analysis

In its motion for partial summary judgment, the City asks the Court to declare that (1) as a matter of law, Employers Mutual has a duty to defend the 2004 and 2006 suits (collectively, "the Barnhart suits") and (2) Employers Mutual must specifically perform that duty.  More particularly, the City asks the Court to find as a matter of law that (1) defendants are "insureds" under the policy; (2) the contract exclusions for property damage and intentional illegal acts and do not apply; and (3)

Kansas public policy does not preclude a duty to defend.

Because this case is before the Court on diversity of citizenship, Kansas choice of laws rules determine which state's substantive law applies.  Mirvillel v. Allstate Indem. Co., 71 F. Supp.2d 1103, 1107 (D. Kan. 1999) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).  In this case, Employers Mutual issued the policy in Kansas, and the underlying suits were filed in Kansas.  Therefore the Court applies Kansas law.  See Aselco, Inc. v. Hartford Ins. Group, 28 Kan. App.2d 839, 848, 21 P.3d 1011, 1018 (2001) (applying lex loci contractus to contract interpretation issue and "place of performance" rule to duty to defend).

Kansas courts determine coverage from the underlying theories of liability alleged.  See, e.g., Brumley v. Lee, 265 Kan. 810, 814, 963 P.2d 1224, 1227 (1998); Pink Cadillac Bar & Grill, Inc. v. U. S. Fid. & Guar. Co., 22 Kan. App.2d 944, 950, 925 P.2d 452, 457 (1996) ("Kansas does not look to the underlying cause of the injury to determine coverage, but looks to the specific theory alleged.") (citation omitted).  Under Kansas law, however, the insurer has a duty to defend if there is any potential for liability under a policy of insurance.  City of Salina, Kan. v. Md. Cas. Co., 856 F. Supp. 1467, 1480 (D. Kan. 1994); Spruill Motors, Inc. v. Universal Underwriters Ins. Co., 212 Kan. 681, 686, 512 P.2d 403, 407 (1973).  In other words, an insurer's duty to defend is broader than its duty to indemnify.  Am. Motorists Ins. Co. v. Gen. Host Corp., 946 F.2d 1489, 1490 (10th Cir. 1991) (insurer may incur duty to defend even though it has no obligation to indemnify liability found against insured).  The insurer must undertake a good faith analysis of all information known to it or reasonably ascertainable by inquiry and investigation in order to determine the possibility of coverage.  See Am. Motorists, 946 F.2d at 1490 (so long as insured can show nonfrivolous possibility that claim may fall within coverage of insurance contract, insurer has duty to defend);

11

Johnson v. Studyvin, 839 F. Supp. 1490, 1495 (D. Kan. 1993) (under Kansas law insurer has duty to defend whenever there is possibility of coverage, even if remote); Spivey v. Safeco Ins. Co., 254 Kan. 237, 246, 865 P.2d 182, 188 (1993) (in determining whether it has duty to defend, insurer must look beyond effect of pleadings and consider any facts brought to its attention, or which it could reasonably discover).  Where a petition alleges an act which the policy clearly does not cover, however, there is no potential of liability.  See Freightquote.com, Inc. v. Hartford Cas. Ins. Co., 316 F. Supp.2d 937, 941 (D. Kan. 2003), aff'd, 397 F.3d 888 (10th Cir. 2005).  An insurer has no duty to defend an action brought "wholly outside any coverage obligations assumed in the policy or when the insurer would have no liability if plaintiff secured a judgment against the insured."  Spruill Motors, 212 Kan. at 685, 512 P.2d at 406.

## I.      Whether McAnany, Jones and Rieke Are "Insureds" Under The Policy

Under the policy, an "insured" includes "[t]he governing board of the 'organization' and each of its past, present, or future lawfully elected or appointed members."  The policy defines "organization" as the entity named in the declarations (the City) and certain subsidiary "authorities, committees or other boards."[8]  McAnany was mayor and a member of the City council, and Rieke and Jones were members of the City planning commission.  The Barnhart suits allege that defendants acted during the time when they served the City in these positions.  They are thus "insureds" under the policy.

The City has the burden to establish coverage, i.e. the nature of any alleged loss and that the loss was caused by one of the perils insured against.  Advantage Homebuilding, 470 F.3d at 1008.

---

[8]      As noted, when it denied a duty to defend, Employers Mutual assumed that the City planning commission meets the requirements for a subsidiary authority, and thus all three defendants are "insureds" under the policy.

In the pretrial order, the City states that to prevail on its claim for declaratory judgment, it must prove that defendants were sued "in part, in their official capacities." See Pretrial Order (Doc. #23) at 17. Employers Mutual argues that by assuming that burden, the City has basically pled itself out of court since the Barnhart suits do not assert claims against defendants in their official capacities.

This argument is without merit. The policy does not require that insureds be sued in their "official capacities." It covers wrongful acts by insureds acting in "the discharge of 'organizational' duties." The policy does not define "organizational duties," but it defines "organization" as the entity named in the declarations (here, the City) and certain subsidiary "authorities, committees or other boards." The Barnhart suits complain that defendants promoted conditions on development and enactment of restrictive ordinances, and they do not confine their theory of recovery to defendants' conduct as purely private citizens or officials of Quivira, Inc. Therefore – at least in part – the suits allege wrongful acts by defendants in the discharge of organizational duties. Employers Mutual disagrees, citing the City's prior statement that the 2004 petition alleges acts outside the scope of defendants' official duties and which the City has not authorized.[9]

---

[9]     The City replies that its statement was legal posturing in response to defendants' request that the City fund their defense, and not a binding admission. The City also notes that the City Attorney later wrote a letter to the Kansas Insurance Department, stating that "the suit alleges the three individually named officials committed various improper acts during the conduct of official duties on behalf of the City." Plaintiff's Reply (Doc. #28), Ex. V. Employers Mutual responds that the Barnhart suits do not allege compliance with K.S.A. § 12-105b, which requires pre-suit notice for tort claims against a municipality or a municipal employee acting within the scope of employment. See King v. Pimentel, 20 Kan. App.2d 579, 590, 890 P.2d 1217, 1225 (1995) (jurisdictional requirement that plaintiff bringing tort claim alleging that municipal employee was acting within scope of his employment plead compliance with K.S.A. § 12-105b); see also Miller v. Brungardt, 916 F. Supp. 1096, 1100-01 (D. Kan. 1996); Christopher v. State ex rel. Kan. Juvenile Justice Auth., 36 Kan. App.2d 697, 704, 143 P.3d 685, 691 (2006). Employers Mutual asserts that since the suits do not allege such notice, the suits could not pursue claims against defendants in their official capacities. The City correctly responds that the jurisdictional question whether the Barnhart suits allege pre-suit notice as required by K.S.A. § 12-105b does not determine whether their

(continued...)

The Court need not wade into this after-the-fact bickering about who said what. Employers Mutual has not demonstrated, or attempted to demonstrate, that the City's statements are binding admissions or estop the City from demanding a defense under the policy. The contract language governs, and the parties' statements about the contract terms and the Barnhart suits do not limit or expand the duty to defend. The Barnhart suits plainly allege wrongful acts by all three defendants in the discharge, at least in part, of organization duties. They allege that beginning in June of 2001, the three defendants wrongfully used their positions with the City to recommend approval of the 150 foot buffer zone and wrongfully encouraged the City to consider limited density requirements to thwart Barnhart's development. The Court therefore sustains the motion for summary judgment on this issue.

## II.    Exclusions

Employers Mutual has the burden of proving that one or more exclusionary clauses within the policy apply to exclude coverage. Advantage Homebuilding, 470 F.3d at 1008. In order to prevail on its motion for partial summary judgment, the City has the burden to show that there are no genuine issues of material fact and that it is entitled to a judgment as a matter of law. Celotex, 477 U.S. at 323

---

[9](...continued)
allegations give rise to a duty to defend under the policy.

Employers Mutual points out that a municipality and its officials are not liable for damages resulting from legislative functions, including adoption of an ordinance, K.S.A. § 75-6104(a), and that Barnhart could not bring tort actions against the City or its representatives based on enactment of an ordinance. Although the City does not directly counter this argument, it is not dispositive. Plaintiffs frequently bring claims which ultimately are barred by some sort of immunity, including legislative immunity. See Jones v. Wildgen, 320 F. Supp.2d 1116, 1124 (D. Kan. 2004) (citing Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998) (local legislators absolutely immune from suit for their legislative activities)).

### A.     Property Damage Exclusion

Employers Mutual asserts that policy exclusion for property damage claims absolves it of any duty to defend the Barnhart suits.  As noted, the policy excludes coverage for "[p]roperty damage," which it defines as "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not injured."[10]  The City argues that the Barnhart suits seek economic damages related to business activities, not the loss of use of tangible property.  The Barnhart petitions allege damage to Barnhart's prospective business advantage through lost opportunity to develop the Robertson Property.  The suits thus allege loss of use of tangible property that is not physically injured.  "Property damage" includes diminution of property values from defendants' conduct, so such loss would not be covered under the policy.  The suits, however, also allege damage "as a result of the actions of [defendants] including, without limitation, planning, marketing and development costs incurred on the Robertson Property."  These alleged damages fall outside the policy exclusion for loss of use of tangible property that is not injured.  The Court therefore sustains the motion for summary judgment as to this issue.

### B.     Intentional Illegal Acts

The Barnhart suits allege that defendants intentionally engaged in malicious interference with Barnhart's expectancy of future economic benefit from development on the Robertson Property.  Specifically, they allege that defendants wrongfully used their positions with the City and Quivira, Inc. to recommend the buffer zone and limited density requirements. The 2006 petition also alleges

---

[10]      The policy further provides that "Property Damage" includes actual or alleged damages or diminution of property values including but not limited to those that arise from the "insured" exercising or failing to exercise its power of eminent domain including (a) condemnation proceedings and (b) inverse condemnation.

that defendants wrongfully promoted excise taxes, street improvements and curb cuts.[11]  As noted above, the petition did not specify how defendants' conduct was a "wrongful" use of their respective positions.  McAnany testified that as mayor he wrote a letter and appeared before the Unified Government planning commission to express concerns about the potential traffic impact of development around Lake Quivira.

Employers Mutual determined it had no duty to defend because the Barnhart suits allege intentional illegal acts and the contract – as well as Kansas public policy – excludes coverage for intentional acts.  In declining a defense, Employers Mutual noted that both Barnhart cases assert intentional torts: tortious interference with a prospective business advantage and civil conspiracy.[12]

The City seeks summary judgment that as a matter of law, the contract exclusion and Kansas public policy do not apply because (1) defendants did not commit intentional illegal acts and (2) the alleged harm to Barnhart's business was not the natural and probable consequence of the buffer zone ordinance or other alleged misconduct.[13]

---

[11]     Neither party cites evidence whether the City adopted requirements for limited density requirements, excise taxes, street improvements or curb cuts, or explains how Barnhart allegedly suffered damages on account of the fact that defendants promoted them.  Furthermore, it is not clear how defendants "wrongfully" used their respective positions to advocate these requirements.

[12]     The parties apparently assume that any duty to defend the civil conspiracy claim is the same as for the tortious interference claim, since they do not separately analyze Barnhart's theories of recovery.  The Court therefore finds that they have forfeited any rights to demand or deny a defense of the civil conspiracy claims, separate from the intentional interference claims.

[13]     The parties appear to believe that in this case, the policy exclusion for intentional illegal acts is co-extensive with Kansas public policy which prohibits insurance coverage for intentional and malicious acts.  See Wisdom v. Saint Paul Fire & Marine Ins. Co., 302 F. Supp.2d 1235, 1238 (D. Kan. 2004) (under Kansas law, public policy prohibits insurance coverage for intentional and malicious acts).  The parties also agree that application of the policy exclusion for intentional illegal acts and Kansas public policy can be considered together.  The Court questions

(continued...)

**1.      Contract Exclusion For Intentional Illegal Acts**

In addressing these arguments, the Court preliminarily notes that – notwithstanding the loose language in the parties' briefs – the insurance contract does not categorically exclude liability for "intentional acts" or even "intentional illegal acts."  It excludes liability for intentional illegal acts where (1) the illegality was known, prior to commitment of the act; or (2) corrective steps were not taken after the illegality of the act was determined.  Neither party addresses the language of the policy exclusion, but it plainly applies to criminal rather than to civil acts.  See Park Univ. Enter. Inc. v. Am. Cas. Co., 314 F. Supp.2d 1094, 1110 (D. Kan. 2004); Guaranty Nat. Ins. Co. v. McGuire, 173 F. Supp.2d 1107, 1112-1114 (D. Kan. 2001) ("illegal" connotes criminal act as opposed to civil wrong).  The Barnhart suits do not allege that defendants committed criminal acts, that defendants knew that their acts were criminal when they committed them, that the acts have been "determined to be criminal," or that defendants failed to take corrective steps after the illegality was determined.  Consequently, the Barnhart suits do not allege "intentional illegal acts" within the meaning of the policy exclusion.  The City is entitled to summary judgment on the policy exclusion for "intentional illegal acts."

---

[13](...continued)
this assumption, see State Farm Fire & Cas. Co. v. Falley, 23 Kan. App.2d 21, 28-29, 926 P.2d 664, 668 (1997), because the parties have not demonstrated that the contract exclusion and the relevant Kansas public policy are co-extensive.  Specifically, while Kansas public policy would almost certainly prohibit indemnity for intentional illegal (criminal) acts, it is not so clear that Kansas public policy would prohibit an agreement to defend allegations of intentional (non-criminal) acts where the policy does not exclude coverage or a duty to defend, the insured denies malice or specific intent to injure, and (based on information reasonably available to the insurer) it is not clear that the insured expected the injury which resulted from his intentional acts or that the resulting injury was a natural and probable result of ths insured's  conduct.  If Kansas public policy does prohibit an agreement to defend such claims, the Court would expect to find that policy clearly stated in relevant statutes or case law and would expect Employers Mutual to cite that authority.

## 2.      Kansas Public Policy Regarding Intentional Torts

The elements of tortious interference with a prospective business advantage or relationship are (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that except for defendant's conduct, plaintiff would have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages as a direct or proximate result of defendant's misconduct. Sunlight Saunas, Inc. v. Sundance Sauna, Inc., 427 F. Supp.2d 1032 (D. Kan. 2006). Tortious interference with a prospective business advantage requires malicious conduct by defendant. Id. (citing Burcham v. Unison Bancorp, Inc., 276 Kan. 393, 424-25, 77 P.3d 130, 151 (2003)). Malice has been defined as "evil-mindedness or specific intent to injure," or as a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse. Turner v. Halliburton Co., 240 Kan. 1, 8, 722 P.2d 1106, 1113 (1986). Employers Mutual refused to defend Barnhart's claims for tortious interference because Kansas public policy precludes insurance coverage for intentional and malicious acts. See, e.g., Wisdom, 302 F. Supp.2d at 1238 (Kansas public policy prohibits insurance coverage for intentional and malicious acts); Spruill Motors, 212 Kan. at 686, 512 P.2d at 407. Employers Mutual argues that this public policy prohibits it from defending claims for tortious interference with prospective business advantage. The precise contours of Kansas public policy, however, are not so clear. The cases tend to loosely merge their analyses of duties to indemnify, duties to defend, contract exclusions and public policy exclusions, and they are even unclear on what acts are "intentional" for purposes of the contract and public policy exclusions.

Many Kansas public policy cases deal with scenarios where an insured is sued for an

intentional tort, asserts a lack of requisite intent, and argues that the conduct was merely negligent and therefore potentially covered by insurance.  For example, in <u>Spruill Motors</u>, the insured faced claims for intentional personal injuries and property damage when employees took a vehicle from a customer and drove it over the customer's foot.  Although the petition in the underlying action alleged intentional acts, the employees denied intentional acts, and the insured employer argued that the injury could have resulted from negligence which was covered under the policy.  The district court granted summary judgment for the insurer, finding no duty to defend because the policy only provided coverage for bodily injury due to an "accident," which it defined as "neither expected nor intended from the standpoint of the insured." <u>Spruill Motors</u>, 212 Kan. at 684-86, 512 P.2d at 405-06.

On appeal, the Kansas Supreme Court reversed.  It first declared that Kansas public policy prohibits coverage for intentional and malicious acts. <u>Id.</u> at 686, 512 P.2d at 407.  It noted, however, that in determining whether it has a duty to defend, the insurer cannot rely solely on the allegations of the complaint but must determine based on "reasonably ascertainable" facts whether the acts may have been unintentional.  If so, coverage could exist and the duty to defend could arise. <u>Id.</u> at 686-87, 512 P.2d at 407.  Applying this standard, the Supreme Court found that the insurer could not properly deny a defense, because although the taking of the truck was intentional, the taking had not caused the personal injury to the customer.  <u>See id.</u> at 688-89, 512 P.2d at 408-09.  The customer's injury resulted from the manner in which the truck was driven, which arguably was unintentional.  <u>Id.</u> (intentional act may cause unintended injury; insurer had duty to defend because under facts insured may not have intended to injure third party).

In other cases, "egregious facts" did not permit an alternative scenario which might result in potential coverage under a policy of insurance.  For example, this Court has noted that some cases

19

permit no reasonable inference of unintended injury to another:

> [Many such] cases included the intentional discharge of firearms, intentional assault and battery, sexual harassment, and intimidation. See generally Quality Painting, 988 P.2d at 750-51 (considering facts where insured engaged in acts of intentional sexual harassment and discrimination); Harris, 867 P.2d at 326 (considering facts where insured fired shots into pickup truck knowing that his ex-wife was in the truck and that the truck did not belong to his ex-wife); Spivey, 865 P.2d at 184, 186 (considering facts where insured threatened an employee with a knife and gun, discharged a gun at her, and forced her to perform sexual acts); Bell v. Tilton, 234 Kan. 461, 674 P.2d 468, 470 (1983) (considering facts where insured intended to discharge BB gun toward playmate's face); Cas. Reciprocal Exch. v. Thomas, 7 Kan.App.2d 718, 647 P.2d 1361, 1362-63 (1982) (considering facts where insured pointed gun at individual and fired).

See Park Univ., 314 F. Supp.2d at 1104.  In such cases, the intent to injure could be inferred from the intentional act, the injury was the "natural and probable consequence" of the intentional act, and under Kansas public policy the insurer had no duty to defend.  See id.

The Tenth Circuit recently applied the "natural and probable consequence" test to a claim for insurance coverage and defense of a lawsuit which alleged tortious interference with contractual and business relations.  See Freightquote.com, Inc. v. Hartford Cas. Ins. Co., 397 F.3d 888 (10th Cir. 2005).  There, in the underlying suit, Gateway alleged that Freightquote had sent letters to Gateway customers stating that Gateway was untrustworthy, dishonest and involved in criminal activity.  Id. at 894.  Gateway sued for tortious interference with contractual and business relations.  Freightquote demanded coverage and a defense.  Hartford asserted that it had no duty to cover or defend because the policy excluded coverage for "expected or intended injuries."  Freightquote argued that the policy exclusion for "expected or intended injuries" did not apply because although it intended to send the letters, it did not intend to tortiously interfere with Gateway's contractual and business relations.  The district court rejected Freightquote's argument and granted summary judgment to Hartford.

The Tenth Circuit affirmed.  It noted that Kansas law distinguishes an intended injury from

an unintended injury which results from an intentional act, id. at 893, and that Freightquote's analysis

did not consider the Kansas definition of an intentional injury.  Id.  The Court reasoned as follows:

> The [exclusion for "expected or intended injury"] does not require Hartford to show
> that Freightquote acted with the specific intent to tortiously interfere with Gateway's
> business.  Nor is Hartford required to show that Freightquote acted with the belief that
> its actions were "substantially certain" to cause injury.  Instead, "[w]here an
> intentional act results in injuries which are a natural and probable result of the act, the
> injuries are intentional.  Thus, the question for us is not whether Freightquote
> specifically intended to tortiously interfere with Gateway's contractual and business
> relations, but whether harm to Gateway's contractual and business relations was the
> natural and probable consequence of Freightquote's actions.

Id. (internal citations omitted).  The Tenth Circuit reviewed the evidence that could be reasonably

ascertained at the time Hartford denied a defense, including the Freightquote letter and a newspaper

article which suggested that Gateway principals were involved in racketeering. The Tenth Circuit held

that a reasonable trier of fact could only conclude that the natural and probable consequence of

Freightquote's actions was to intentionally interfere with Gateway's contractual and business relations.

Therefore Hartford did not have a duty to defend or indemnify the Gateway suit.  Id. at 894.  In

Freightquote, however, the *policy language* excluded contract coverage for "expected or intended"

injury, and the Tenth Circuit held that where the alleged injury is the natural and probable

consequence of the intentional act, the record *as a matter of law* reveals no genuine issue of material

fact whether plaintiff "expects" or "intends" the injury.  Id.

Employers Mutual asserts that Freightquote compels a conclusion that it has no duty to defend

because a jury would necessarily find that the natural and probable consequence of the 150 foot buffer

zone was to harm the business interests of Barnhart and Quivira Village.[14]  This argument begs the

---

[14]      In addition to the buffer zone, the Barnhart suits allege other wrongful acts of
defendants: (1) encouraging the City to consider limited density requirements and (2) promoting
City requirements for excise taxes, street improvements and curb cuts.  Employers Mutual does not
(continued...)

question.  Nothing in the information available to Employers Mutual suggested that defendants voted for the buffer zone ordinance or were even capable of enacting a buffer zone requirement.  The Barnhart suits allege only that defendants recommended a buffer zone.  On this record, nothing suggests that defendants' recommendation (as opposed to the enactment of Ordinance 213) injured Barnhart in any way.  Therefore, a jury would not necessarily find that any injury to Barnhart and Quivira Village was the natural and probable result of defendants' recommendation.  Moreover, the Freightquote analysis does not inform the argument that Kansas public policy prohibits an agreement to defend in the circumstances of this case.  The Freightquote analogy may have superficial appeal, but it ignores the specific wrongful conduct which Barnhart and Quivira Village allege (recommending a buffer zone).

Employers Mutual knew or could reasonably have ascertained that defendants did not vote on the buffer zone and that even if they recommended the buffer zone, a reasonable fact finder would not necessarily conclude (1) that Barnhart's injury was the natural and probable consequence of defendants' recommendation or (2) that defendants would have reasonably expected their recommendation to result in financial injury to Barnhart.[15]  The Barnhart suits do make conclusory allegations of intentional misconduct.  The contract of insurance does not exclude coverage for such

---

[14](...continued)
claim that the natural and probable consequence of defendants' advocacy was to harm the business interests of Barnhart and Quivira Village.  Because Employers Mutual does not address these theories of recovery, Employers Mutual has waived any argument in that regard.

[15]    Employers Mutual cites no evidence that the buffer zone prevented Barnhart from developing the property or reduced the value of the Robertson Property, and the parties do not address what information was available to Employers Mutual on that issue.  Because Employers Mutual has the burden of proof on the public policy exclusion, the Court assumes that it would have cited any evidence that when it denied coverage, it was aware of evidence that defendants' recommendation prevented Barnhart from developing the property or caused a diminution in its value, and that defendants expected and intended this result.

22

wrongful acts, however, and defendants denied intentional misconduct, malice or intentional injury to Barnhart.  Furthermore, Employers Mutual had no reason to discredit defendants' position: apparently nothing in the information available to Employers Mutual dictated a conclusion that (1) defendants expected to injure Barnhart by recommending the buffer zone, or (2) Barnhart's alleged injury was the natural and probable result of their recommendation.  This case is analogous to Spruill Motors, because the insurer could not reasonably conclude that defendants' conduct (encouraging a buffer zone) was intended, expected or necessarily and probably certain to cause the injuries alleged.  Such facts were readily ascertainable when Employers Mutual denied a defense, and Employers Mutual has cited no public policy which would prohibit it from honoring its duty to defend in the circumstances of this case.[16]

Employers Mutual asserts that whether or not Barnhart succeeds on his claims, there is no possibility of coverage and thus no duty to defend.  The insurer bears the duty to defend when there is a "potential of liability" under the policy.  Quality Painting, Inc. v. Truck Ins. Exch., 26 Kan. App.2d 473, 988 P.2d 749, 752 (1999).  The insurer must undertake a good faith analysis of all information known to it or reasonably ascertainable by inquiry and investigation in order to determine the possibility of coverage.  See Am. Motorists, 946 F.2d at 1490.  If there is a nonfrivolous possibility

---

[16]     As the Court reads the Barnhart complaints, they do not seek recovery on any theory of negligence.  The theory of recovery in the Barnhart complaints is intentional malicious interference with prospective business advantage or relationship.  As in Spruill Motors, however, defendants deny malice or intent to injure and injury to Barnhart was not necessarily intended or expected, or necessarily and probably certain to result from, a simple recommendation for a buffer zone.  The Court agrees that allowing an insured to simply state that it did not intend to inflict injury would force insurers to defend cases where the acts were clearly intended to injure.  This point has limited application to this case, however, because Employers Mutual could ascertain from the face of the petitions that a simple decision to recommend a buffer zone would not necessarily or probably cause the injuries of which Barnhart complained, and a reasonable person would not necessarily expect injuries to flow from such a recommendation.  These facts, coupled with defendants' denial of intent to injure Barnhart, distinguish this case from Freightquote.

that the claim may fall within coverage of the insurance contract, the insurer has a duty to defend. Id. Employers Mutual has a duty to defend suits seeking monetary damages *covered under the policy*. As noted above, defendants were insureds under the policy, which obligated Employers Mutual to pay defense expenses to which the insurance applied, i.e., to claims for compensatory damages because of wrongful acts. As noted, the Barnhart suits seek monetary damages covered under the policy because the policy covers "wrongful acts" by insureds and Employers Mutual has demonstrated no genuine issue of material fact whether any contract exclusion exonerates it from a duty to indemnify or defend. Therefore, as a matter of contract interpretation, the Barnhart claims are claims to which the policy applies. The insurance contract clearly contemplates coverage and a duty to defend, and the only relevant defense is one of Kansas public policy.

The Court has searched in vain for any cogent statement of Kansas public policy which would defeat the City's claim to a defense. The policy against indemnity for intentional and malicious acts cannot be the relevant public policy because, as noted above, the Barnhart suits' sole allegation of misconduct (recommending the buffer zone) was not necessarily intended or expected or necessarily and probably certain to cause the alleged injury to Barnhart. In any event, Employers Mutual cites no public policy which prevents it from agreeing to defend suits which it could not lawfully agree to indemnify. Indeed, to some degree, by restricting the category of "intentional acts" for which coverage and defense may be denied, the Kansas cases evidence a policy of containing the public policy exception within narrow channels, so that insureds receive the full measure of protection which insurance companies market to them. In that regard, Employers Mutual cites no case where the Kansas public policy against coverage for intentional acts – standing alone – has defeated an otherwise valid contractual obligation of insurance. Further, the Kansas Supreme Court has found that where

an insurance policy provided that it would defend groundless suits for damages payable under the policy, a policy exclusion for intentional damages did not defeat a duty to defend tort claims for assault and battery.  See Gowing v. Great Plains Mut. Ins. Co., 207 Kan. 78, 79, 483 P.2d 1072, 1074 (1971) (policy ambiguous because it limited coverage for bodily injury or property damage caused intentionally but also provided a defense for "groundless, false or fraudulent" suits for damages payable under policy; court therefore construed policy in favor of insured); cf. Park Univ., 314 F. Supp. 2d at 1106 (court rejected insurer's argument that as matter of public policy it was not required to defend cases for "non-fortuitous" damages; court concluded that insurer's "public policy" argument was mere permutation of argument that insured intended damages); State Farm Fire & Cas. Co. v. Falley, 23 Kan. App.2d 21, 27, 926 P.2d 664, 668 (1996) (public policy prohibiting coverage for intentional and malicious acts not served by overly restrictive construction of intentional act exclusion).

Employers Mutual cites no cases which support the proposition that Kansas public policy precludes insurance for the *defense of lawsuits* which allege intentional torts.  Based on the cases discussed above, Kansas public policy prohibits indemnity for intentional harm rather than – more broadly – indemnity for intentional torts.  As noted above, an intentional act may yield an unintended or unexpected injury.  Moreover, in this case, the policy language does not even exclude coverage for intentional torts.[17]  In the employment context, when Kansas courts have considered whether to create remedies based on public policy, they have stated that before courts are justified in declaring the existence of public policy, "it should be so thoroughly established as a state of public mind so united

---

[17]     Here, the contract excludes coverage for "intentional criminal acts" and, as noted above, the policy exclusion for intentional criminal acts does not apply.  Indeed, with some exceptions, the policy provides coverage for "personal injury" arising from intentional torts such as false arrest, malicious prosecutions and wrongful entry.

and so definite and fixed that its existence is not subject to any substantial doubt." Palmer v. Brown 242 Kan. 893, 896-97, 752 P.2d 685, 687-88 (1988); see also Aiken v. Bus. & Indus. Health Group, Inc., 886 F. Supp. 1565, 1573 (D. Kan. 1995) (exceptions to employment at will are narrow and apply only to circumstances in which contested discharge seriously contravenes public policy). The requirement that Kansas public policy be clearly articulated applies with equal force here. Kansas public policy does not preclude Employers Mutual's contractual duty to defend the Barnhart suits.

**IT IS THEREFORE ORDERED** that the City's Motion For Partial Summary Judgment (Doc. #24) filed June 22, 2007 be and hereby is **SUSTAINED**. The Court finds that Employers Mutual has a duty under the insurance policy to defend McAnany, Rieke and Jones as to the tortious interference claims in the Barnhart suits to the extent that such claims allege damages for planning, marketing and development costs incurred on the Robertson Property. Employers Mutual shall specifically perform that duty.

The City's claims for damages for breach of contract and attorneys fees under K.S.A. § 40-256 remain for trial.

Dated this 2nd day of November, 2007 at Kansas City, Kansas.

s /Kathryn H. Vratil
Kathryn H. Vratil
United States District Court

26